UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 23-23363-CV-WILLIAMS

DIS INVESTMENTS, LLC,

    Plaintiff,

v.

GREAT LAKES INSURANCE SE,

    Defendant.
_____/

## ORDER

**THIS MATTER** is before the Court on the Motion for Summary Judgment (DE 39) ("***Motion***") filed by Defendant Great Lakes Insurance SE ("***Defendant***" or "***GLISE***") to which Plaintiff DIS Investments, LLC ("***Plaintiff***" or "***DIS***") filed a Response (DE 46) ("***Response***"), and GLISE filed a Reply (DE 54) ("***Reply***").[1] Having carefully reviewed the Motion and for the reasons set forth below, GLISE's Motion for Summary Judgment (DE 39) is **GRANTED**.

**I.   BACKGROUND** [2]

    **A.  *Factual Background***

The subject insurance coverage dispute involves property damage sustained at a commercial warehouse located at 5600 NW 32nd Avenue, Miami, Florida ("***Warehouse***").

---

[1] Additionally, the Court reviewed and considered Plaintiff's Notice of Supplemental Authority (DE 48) filed four (4) days after its Response.

[2] In accordance with Southern District of Florida Local Rule 56.1, the Parties properly filed separate and contemporaneous Statements of Material Facts. *See* S.D. Fla. L.R. 56.1(a). The Court will cite to the GLISE's Statement of Material Facts (DE 38), Plaintiff's Statement of Disputed Facts (DE 45), and GLISE's Reply Statement of Material Facts (DE 55).

(DE 38 at 1.)  Plaintiff DIS Investments, LLC owns and operates the 70,000 square-foot Warehouse and uses the structure primarily to store vintage clothing and recycled apparel. (DE 45 at 3; DE 46 at 4.) Procuring insurance coverage for the Warehouse, DIS obtained a commercial lines insurance policy bearing Policy No. ECKPR0103-22 ("**Policy**") from GLISE for a policy period from June 10, 2022 to June 10, 2023 ("**Policy Period**").  (DE 38 at 1; DE 38-1 at 28.)

On October 6, 2022, DIS filed an insurance claim with GLISE, reporting property damage to the Warehouse as a result of Hurricane Ian. (DE 38 at 3.)  Upon receipt of Plaintiff's notice, GLISE assigned Plaintiff's claim with the claim number 221769 ("**Claim**") and designated Wheeler, Defusco & Associates ("**Wheeler**"), a third-party claim administrator and adjuster, to investigate the loss.  (DE 1-2 at 6; DE 38-1 at 2; DE 39 at 3.)  Following its inspection, Wheeler concluded the cause of loss was a roof leak due to ineffective and substandard roof repairs and age-related deterioration of the roof membrane.[3]  (DE 38 at 3.)  They determined that the damage was unrelated to Hurricane Ian.  (DE 38 at 3.)

Notwithstanding Wheeler's position, it recommended an independent engineer be retained to conduct further inspection and confirm the cause of loss.  (DE 38 at 3.)  Independent Forensics Group, LLC ("**IFG**"), an engineering firm, was retained on November 16, 2022, and inspected the Warehouse on December 8, 2022. (DE 38 at 3.)

---

[3] Andre Rodriguez ("**Rodriguez**"), Wheeler's representative who conducted the inspection, issued a reserve recommendation of $275,000 as replacement value for the damage to the Warehouse.  (DE 45 at 4.) Rodriguez testified that the reserve recommendation amounts to his opinion on the cost of covered repairs in the event the insurer covers the cause of loss.  (DE 45-5 at 125:2–126:9.)

IFG's engineer, Madis Rua, P.E., conducted the inspection and prepared an Engineering Assessment affirming Wheeler's conclusion and finding there was moisture and condensation released along the ductwork in the ceiling. (DE 38 at 3.) Moreover, aerial images depicted multiple repairs performed on the roof throughout the years. (DE 38 at 3–4.) Upon review of Ms. Rua's Assessment, GLISE sent a letter denying coverage for DIS' Claim on January 17, 2023. (DE 38 at 4; DE 38-1 at 79–81.)

After conducting its own inspections and investigation, Plaintiff disputes Wheeler's and Ms. Rua's assessments as to the cause of loss to the Warehouse. (DE 45 at 2.) Plaintiff avers it was unaware of any roof leaks prior to Hurricane Ian's landfall in South Florida. (DE 45 at 3.) However, in the immediate aftermath, DIS attests that its personnel noticed leaks on the floor and substantial traces of water inside the Warehouse. (DE 45 at 3; DE 45-2 at 22:17–23:21.) DIS declares that only immediately following Hurricane Ian did DIS make emergency temporary repairs to the roof. (DE 45-2 at 20:4–20:22.) Additionally, DIS retained Stellar Public Adjusting Services, LLC ("***Stellar***") to inspect the property. (DE 45 at 3.) Stellar's adjuster, Rami Boaziz, inspected the Warehouse on October 17, 2022, and prepared an estimate for the damages totaling $3,124,902.88. (DE 39 at 4; DE 45 at 3–4.) DIS also retained a separate engineer, Eric Trillas P.E., who inspected the Warehouse and prepared a Storm Damage Evaluation Assessment dated January 4, 2024. (DE 45 at 4.) In Mr. Trillas' Assessment, he reports numerous problems that he attributes to "excessive and cyclical wind pressures causing uplift and fatigue failures," in support of his conclusion that the damage and loss to the Warehouse was caused by Hurricane Ian. (DE 45 at 4–5.)

With respect to the insurance coverage on the Warehouse, the Policy provides "for direct physical loss of or damage to Covered Property . . . caused by or resulted from any Covered Cause of Loss." (DE 38 at 1.)  Because the Policy's Declaration Page denotes Covered Cause of Loss to be "[s]pecial," the limitation of coverage is set out in a "special" form which defines "Covered Causes of Loss" as "direct physical loss unless the loss is excluded or limited in [the] [P]olicy." (DE 38-1 at 28, 53.)  Named coverage exclusions include,

> loss or damage caused by or resulting from . . . (1) wear and tear; (2) rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself . . . (4) [s]ettling, cracking, shrinking or expansion . . . (6) Mechanical breakdown . . . (f) Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more . . .

(DE 38-1 at 55.)

Additionally, the Policy does not cover loss or damage caused by or resulting from "faulty , inadequate, or defective: (1) [p]lanning, zoning, development, surveying, siting; (2) [d]esign, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction; (3) [m]aterials used in repair, construction, renovation or remodeling; or (4) [m]aintenance; of party or all of any property on or off the described premises." (DE 38-1 at 56.)  In particular, as it relates to water damage from rain, the Policy establishes a condition precedent, declining to cover any loss that is a consequence of loss or damage to the "interior of any building or structure, caused by or resulting from rain . . . whether driven by wind or not, unless: (1) [t]he building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the

rain . . . enters . . . ." (DE 38-1 at 58.)  Notably, the Policy does not exclude loss or damage caused by a hurricane or windstorm. (DE 38-1 at 53–62.)

### B. Procedural Background

Following the GLISE's denial of Plaintiff's Claim, Plaintiff filed this civil action on July 25, 2023, against Defendant in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida alleging a single breach of contract claim. (DE 1-2 at 5–7.)  After serving GLISE with its summons and complaint on August 2, 2023, Plaintiff served its post-suit written settlement demand offering to resolve the litigation with a $3,134,947.94 global settlement.  (DE 1 at 4–5.)   Upon receipt of this demand, on September 1, 2023, Defendant timely removed the civil action from state court to federal court pursuant to 28 U.S.C. § 1441(a).[4]  Given that federal diversity jurisdiction is proper,[5] Defendant timely filed its Answer seven (7) days after its notice of removal was filed. Fed. R. Civ. P. 81(c)(2). The Parties subsequently completed discovery and Defendant filed the instant Motion seeking summary judgment pursuant to Federal Rule of Civil Procedure 56.

---

[4] Pursuant to the federal removal statute, in the event a civil action is not removable based on the initial pleading, then a notice of removal may be filed with thirty (30) days of the defendant's receipt "of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." 28 U.S.C. § 1446(b)(3).  *See also 4649 NW 36 St., LLC v. Scottsdale Ins. Co.*, 2021 WL 883495, at *3 (S.D. Fla. Feb. 21, 2021) ("This settlement offer, which is a document that Defendant received from Plaintiff after litigation commenced, constitutes 'other paper' and beg[ins] the 30-day removal deadline.").

[5] In addition to the Parties satisfying the amount-in-controversy requirement, the Court finds that there is complete diversity of citizenship between the Parties as Plaintiff DIS Investments, LLC is a registered Florida company with two members who are Florida residents and Defendant Great Lakes Insurance SE is a German corporation with its principal place of business in Munich, Germany. 28 U.S.C. § 1332(a).

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[O]nly disputes over facts that might affect the outcome of the suit under the governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 248 (1986). Any such dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the Court considers the evidence in the record, "including depositions, documents, electronically stored information, affidavits, or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The party seeking summary judgment carries the burden of "informing the district court of the basis for this motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. "To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case." *Feinman v. Target Corp.*, 2012 WL 6061745, at *3 (S.D. Fla. Dec. 6, 2012) (citing *Celotex*, 477 U.S. at 325). Once the movant satisfies their burden, the burden of production shifts to the non-moving party, which must "do more than simply show that there is some

metaphysical doubt as to the material facts." *Matsuchita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party and must resolve all reasonable doubts about the facts in favor of the non-movant." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008) (quotations, citations omitted). However, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252; *see also Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). Evidence that is "merely colorable" or "not significantly probative" is insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 249–50. At the summary judgment stage, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

### III. DISCUSSION

As a pure question of law, the interpretation of an insurance policy may be decided at the summary judgment stage. *State Farm Mut. Auto. Ins. Co. v. Spangler*, 64 F.4th 1173, 1178 (11th Cir. 2023). Because this case is a diversity action, the Court shall apply the substantive law of the forum state, Florida. *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1515 (11th Cir. 1997); *Admiral Ins. Co. v. Feit Mmgt. Co.*, 321 F.3d 1326, 1328 (11th Cir. 2003). Under Florida law, a breach of contract action requires three elements: (1) a valid contract, (2) a material breach, and (3) damages. *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999) (citing *Abruzzo v. Haller*, 603 So.

2d 1338, 1340 (Fla. Dist. Ct. App. 1992)).  To constitute a material breach, a party's nonperformance must "go to the essence of the contract." *Covelli Family, L.P. v. ABG5, LLC*, 977 So. 2d 749, 752 (Fla. Dist. Ct. App. 2008) (citations omitted).  Consequently, the party injured by a breach of contract is entitled to an award of damages that "naturally flow from the breach and can reasonably be said to have been contemplated by the parties at the time the contract was entered into." *Mnemonics, Inc. v. Max Davis Assocs., Inc.*, 808 So. 2d 1278, 1280 (Fla. Dist. Ct. App. 2002) (citations omitted).

In the Complaint, DIS alleges Defendant GLISE breached the terms of its insurance policy by failing to adjust the Claim pursuant to the Policy's Loss Payment provision and by refusing to compensate DIS for the damages incurred on the Warehouse.[6] (DE 1-2 at 6–7.)  GLISE now seeks summary judgment as to causation and recoverable damages, arguing (1) Plaintiff lacks admissible evidence to prove that the damages observed at the Warehouse were caused by a covered loss and (2) there is no evidence Plaintiff performed any appropriate repairs or replacement and Plaintiff's damages evidence is an improper effort to recoup replacement costs and matching costs in violation of the Policy's conditions.  (DE 39 at 7, 11.)  In response, DIS asserts there is a genuine dispute of material fact related to causation as both Parties offer conflicting

---

[6] The Loss Payment provision sets out that
> "[i]n the event of a loss or damage covered by [the Policy] at [GLISE's] option, will either: (1) [p]ay the value of lost or damaged property; (2) [p]ay the cost of repairing or replacing the lost or damaged property subject to **b.** below; . . . (4) [r]epair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below. . . b. The cost of repair, rebuild or replace does not include the increased costs attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property."

(DE 38-1 at 39.)

expert reports setting the stage for a "battle of the experts." (DE 46 at 2.) Separately, with respect to damages, DIS maintains that an estimate premised on replacement cost is an adequate measure to establish DIS' damages at least to surpass summary judgment. (DE 46 at 2.)

### A. Causation

First, Defendant challenges the reliability of Plaintiff's causation evidence, disputing Mr. Trillas' expert opinion that the property damage and loss to the Warehouse was caused by Hurricane Ian.[7] In the event that Mr. Trillas' report and opinion are excluded, Defendant argues that Plaintiff would fail to satisfy its burden of demonstrating the existence of a covered loss during the Policy Period. (DE 39 at 10.) In response, Plaintiff rejects Defendant's characterization of Mr. Trillas' expert report and maintains Mr. Trillas' opinion reliably rebuts the findings and conclusions of Defendant's expert engineer Ms. Rua. (DE 46 at 4–5.) According to Ms. Rua's assessment, the visible water stains in the Warehouse's ceiling resulted from roof leaks due to age-related deterioration. (DE 38 at 3.) She concluded that the color and pattern of the water stains indicated water had been saturating the ceiling for multiple months and was not associated with a one-time storm event. (DE 38 at 3.) Mr. Trillas advances a contrary opinion; the property damage at issue is attributable to Hurricane Ian because wind gusts between thirty-nine (39) to fifty (50) miles per hour led to impact damage and fatigue failure between the seams of the roof system. (DE 45 at 5.) In support of his conclusion, Mr. Trillas cites to his observations of "cascading…cracks on the exterior of the building," and soft spots,

---

[7] With respect to Mr. Trillas, GLISE filed a contemporaneous motion to exclude expert opinion (DE 36) pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579, 597 (1993).

cracking, and peeling of the roofing membrane, which he attributes to be symptomatic of prolonged wind pressure exerted on the Warehouse for eighteen (18) hours because of Hurricane Ian. (DE 45 at 4–5.)

In the end, the factual determination as to the causal event that led to the underlying property damage to the Warehouse is one that must be determined by a jury. In light of the opposing expert reports and opinions presented, summary judgment would be improper on the issue of causation as it would require the Court to improperly weigh competing evidence and make a credibility determination to reach a resolution. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."). Accordingly, the Parties' evidence regarding causation presents disputed issues of material fact that require the denial of summary judgment. *See Garcia v. First Cmty. Ins. Co.*, So. 3d 254, 257–58 (Fla. Dist. Ct. App. 2018) (finding that summary judgment is improper where the conclusions reached by opposing engineers regarding the cause of a roof leak are "clearly at odds").

### B. Damages

Next, Defendant contends Plaintiff's proof of damages is insufficient to find GLISE liable because there is no evidence Plaintiff performed any permanent repairs as required by the Policy's replacement cost provision. (DE 39 at 11.) In response, Plaintiff maintains it has sufficiently established damages exceeding the Policy's deductible by way of Mr. Boaziz's estimate, which may be used to account for the replacement cost value or, as a

last resort, the actual cost value associated with restoring the Warehouse to its pre-loss condition.  (DE 46 at 6–12.)

When "interpreting an insurance contract," a court is "bound by the plain meaning of the contract's text." *State Farm Mut. Auto. Ins. v. Menendez*, 70 So. 3d 566, 569 (Fla. 2011). Under Florida law, where the language in an insurance contract is plain and unambiguous, a court must interpret the policy in accordance with the plain meaning so as to give effect to the policy as written. *Washington Nat. Ins. Corp. v. Ruderman*, 117 So. 3d 943, 948 (Fla. 2013).  Policy language is considered to be ambiguous if the language "is susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage." *Menendez*, 70 So. 3d at 570 (citing *Travelers Indem. Co. v. PCR Inc.*, 889 So. 2d 779, 785 (Fla. 2004)). If the policy language is ambiguous, "a court will resolve the ambiguity in favor of the insured by adopting the reasonable interpretation of the policy's language that provides coverage as opposed to the reasonable interpretation that would limit coverage." *Travelers Indem. Co.*, 889 So. 2d at 785–86. For an exclusion or limitation in a policy to be enforceable, the insurer must clearly and unambiguously draft a policy provision to achieve that result. *Geico Gen. Ins. Co. v. Virtual Imaging Servs., Inc.*, 141 So. 3d 147, 157 (Fla. 2013).

As it relates to coverage in this case, the Policy provides that Defendant "will pay for direct physical loss of or damage to Covered Property . . . by or resulting from any Covered Cause of Loss." (DE 38-1 at 29.)  In the event of loss or damage, the value of Covered Property is determined by the "actual cash value as of the time of loss or damage" subject to certain exceptions.  (DE 38-1 at 40.)  One exception, as indicated on the Policy's Declaration Page under optional coverages, relates to the valuation of the

building—here, the Warehouse—which shall be estimated according to its replacement cost value. (DE 38-1 at 28.)   Under the terms of the Policy, replacement cost excludes any deduction for depreciation and GLISE "will not pay on a replacement cost basis for any loss or damage: (1) [u]ntil the lost or damaged property is actually repaired or replaced; and (2) [u]nless the repair or replacement is made as soon as reasonably possible after the loss or damage." (DE 38-1 at 43.)

In clear terms, the Policy's language specifies that the valuation of damages or loss to the Warehouse must be calculated according to its replacement cost value. Here, Plaintiff retained Mr. Boaziz as its adjuster who estimated the replacement cost value of the property damage to the Warehouse to be $3,127,902.88.   (DE 38-3 at 114.). Mr. Boaziz's estimate excluded any deduction for depreciation, and as a result it sufficiently sets out Plaintiff's damages consonant with the Policy's terms.[8] (DE 45-4 at 38:19–39:1.) However, because Plaintiff did not perform the necessary repairs to the Warehouse, the Court finds Plaintiff failed to comply with the Policy's conditions that would trigger GLISE's obligation to pay. *CMR Constr. & Roofing, LLC v. Empire Indem. Ins. Co.*, 843 Fed. App'x

---

[8] It is unclear to the Court why Plaintiff maintains an argument that it can prove its damages according to the actual cash value of the loss when the Policy expressly provides that any property loss or damage to the Warehouse would only be assessed according to its replacement cost value. Plaintiff predicates its argument on *Citizens Property Insurance Corporation v. Tio*, 304 So. 3d 1278, 1280 (Fla. Dist. Ct. App. 2020), arguing that it stands for the proposition that when an insurer issues a replacement cost policy the insurer is required initially to pay to its insured at least the actual cash value of the covered loss, less the deductible.  However, the court in *Tio* premised its decision on Florida Statute Section 627.7011(3)—a statute governing adjustment of losses under a replacement cost policy—which does not apply "to policies not considered to be 'homeowners' policies,' as that term is commonly understood in the insurance industry." *See* Fla. Stat. § 627.7011(6)(a). Given that the Policy is a commercial lines insurance policy and not a homeowners' policy, Plaintiff's reliance on *Tio* is misplaced and its discussion of its holding irrelevant.

189, 192 (11th Cir. 2021) (citing *Ceballo v. Citizens Prop. Ins. Corp.*, 967 So. 2d 811, 815 (Fla. 2007)) (concluding that when an "until and unless" provision is plain and unambiguous the insurer is not obligated to pay the insured the replacement cost value until the repairs have been made and the costs incurred); *see also Buckley Towers Condo., Inc. v. QBE Ins. Corp.*, 395 Fed. App'x 659, 663 (11th Cir. 2010) ("Inconvenience or the cost of compliance [with contractual terms], though they might make compliance a hardship, cannot excuse a party from the performance of an absolute and unqualified undertaking to do a thing that is possible and lawful.").

The Policy states in express and explicit language that GLISE will not pay the replacement cost for any loss or damage "until the lost or damaged property is actually repaired or replaced" and "unless the repair or replacement is made as soon as reasonably possible after the loss or damage." (DE 38-1 at 43.) As of the time of Mr. Boaziz's deposition on May 3, 2024, nearly two (2) years after submitting its Claim to GLISE, Plaintiff had neither replaced the roof covering to the Warehouse nor completed any permanent repairs to the interior. (DE 45-4 at 37:16–38:3.) Plaintiff has presented no evidence that it has replaced or repaired the roof of the Warehouse. In fact, since discovering the roof leaks, Plaintiff has only completed temporary "patching," which even Plaintiff's witnesses did not consider to be repairs. (DE 45-2 at 33:3–33:19.) Accordingly, as it relates to damages, summary judgment should be granted.[9] *CMR Constr. & Roofing*,

---

[9] The Court finds that summary judgment should also be entered as it relates to the inclusion of matching costs in Mr. Boaziz's estimate. In his deposition, Mr. Boaziz testified that his estimate included matching costs for the projected repair work. (DE 45-4 at 39:20–39:25.) However, matching damages do not fall within the Policy's terms as coverage is limited to "direct physical loss of or damage to Covered Property . . . by or resulting from any Covered Cause of Loss." *See Battat v. QBE Specialty Ins. Co.*, 2022 WL 1642296,

843 Fed. App'x at 192 (affirming summary judgment for an insurer where the insured sought replacement cost damages but had not made repairs as required by the insurance policy); *Ocean View Towers Ass'n, Inc., v. QBE Ins. Corp.*, 2011 WL 6754063, at *11 (S.D. Fla. Dec. 22, 2011) (ruling that insurer is entitled to summary judgment where repairs have not been initiated in violation of plain policy language providing replacement cost coverage only after "the lost or damaged property is actually repaired or replaced" as soon as reasonably possible).

## IV.   CONCLUSION

Upon review of the Motion, the record, and applicable law, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant Great Lakes Insurance SE's Motion for Summary Judgment (DE 39) is **GRANTED**.[10]

2. All pending motions are **DENIED AS MOOT**.

3. All hearings, trial, and other deadlines are **CANCELED**.

4. The Clerk of Court is directed to **CLOSE** this case.

**DONE AND ORDERED** in Chambers in Miami, Florida on this 29th day of August, 2024.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

---

at *10 (S.D. Fla. Jan. 31, 2022) ("Under Florida law, matching damages do not fall within an insurance policy's definition of 'direct loss' to a property.").

[10] The Court's ruling does not foreclose Plaintiff from pursuing its breach of contract claim seeking replacement cost damages once matching costs have been excluded and the appropriate repairs or replacements have been completed. *See Battat*, 2022 WL 1642296, at *9 n.7.